UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 1:21-cr-698(FYP) |
| v. | : | |
| | : | |
| MARCOS GLEFFE, | : | |
| | : | |
| Defendant | : | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Marcos Gleffe to a split sentence of 45 days incarceration, followed by a term of probation of 36 months, 60 hours of community service, and $500 in restitution.

I.    Introduction

Defendant Marcos Gleffe (hereinafter referred to as "Gleffe"), a 39-year-old self-employed tile worker, who resides in Englewood, Florida, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

Gleffe pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), parading, demonstrating, or picketing in a Capitol Building. As explained herein, a sentence of incarceration

---

[1] Although the Statement of Offense in this matter, filed on September 8, 2022 (ECF No. 30 at p. 2, ¶ 4) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

is appropriate in this case because: (1) the day before the Capitol breach, Gleffe encouraged his Facebook followers to watch and share a live stream video of the "DC event" by searching a Parler account with the handle name, "@fightthefraud"; (2) Gleffe posted pictures and live videos of himself at the rally and on the grounds of the Capitol to his Facebook page; (3) Gleffe approached the Capitol building on the West Front, an area where officers violently battled with the mob of rioters attempting to force their entry inside of the Capitol; (4) as he approached the Capitol, Gleffe observed physical barriers that had been pushed to the ground and rioters fighting with officers; (5) Gleffe entered the Capitol at the Senate Wing Door, approximately 11 minutes after the initial breach of that location; (6) Gleffe was in the group of rioters who initially breached the Crypt; (7) on January 7, 2021, Gleffe used his Facebook account to boast about being at the Capitol and to spread disinformation about the source of the violence at the Capitol; (8) Gleffe deleted his posts from Facebook after January 6; and (9) Gleffe has a criminal history including arrests and a conviction for possession of a controlled substance.

The Court must also consider that Gleffe's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm the police officers trying to prevent a breach of the Capitol Building and disrupt the proceedings. Here, the facts and circumstances of Gleffe's crime support a sentence of a split sentence of 45 days incarceration, followed by a term of probation of 36 months, 60 hours of community service, and $500 in restitution.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7. As this Court knows, a riot

2

cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day.

### A.   Defendant Gleffe's Role in the January 6, 2021 Attack on the Capitol

Before traveling to Washington D.C., Gleffe openly expressed his opinion to friends and family that the result of the 2020 Presidential Election was fraudulently obtained.  Gleffe used his personal Facebook account and social network platform, Parler, to express his views regarding the "stolen election." To support then President Donald Trump, Gleffe decided to travel to Washington D.C. to attend the "Stop the Steal" rally to hear then President Trump speak.

On January 5, Gleffe rented a vehicle and traveled from his home in Illinois to Virginia before going to Washington D.C.  Gleffe rented a hotel room for the nights of January 5 and 6.

On the morning of January 6, Gleffe went to the Trump "Stop the Steal" rally. After attending the rally, Gleffe followed a group of rally attendees as they walked to the Capitol.  Gleffe approached the Capitol from the West Front. Shortly before 2:00 p.m., along with thousands of others, Gleffe, entered the Capitol Grounds and approached the Capitol Building from the northwest direction.  Gleffe used his cellphone to take a picture of himself on the Capitol Grounds. *See Image* 1, below.

*Image 1*



At approximately 12:52 p.m., rioters first breached the outer perimeter of the Capitol Grounds near the Peace Circle at the end of Pennsylvania Avenue (Area A *Image* 2, below), shoving the handful of United States Capitol Police ("USCP") officers stationed at the barriers there out of the way and flooding onto the Lower West Plaza of the Capitol (Area C in *Image* 2, below).  At approximately 2:09 p.m., rioters broke through a line of USCP officers standing on the landing of the northwest stairwell.  The mob of rioters surged towards the Capitol building.

*Image 2*



Gleffe continued to make his approach closer to the Capitol. As he approached, Gleffe joined in with a mass of protestors on the West Lawn of the Capitol. This area was the sight of numerous violent clashes between protestors and police officers. Gleffe personally observed the violence that occurred. *See* Images 3 and 4, below.

*Image 3*



4

*Image 4*



Gleffe used his cellphone to take photographs and/or videos of the physical clash between protestors and officers. *See* Image 5, below.

*Image 5*



Additional images show Gleffe standing within feet of members of the Metropolitan Police Department as they were being confronted by police officers. *See* Images 6 and 7, below.

*Image 6*



5

*Image 7*



Prior to entering, Gleffe stopped near the building to have a picture of himself taken as he drank from a can while holding two Trump flags. Gleffe would later use the photograph as his Facebook profile picture. *See* Image 8, below.

*Image 8*

At approximately 2:12 p.m., a group of rioters standing outside of the Senate Wing Door began to violently attempt to break into the Capitol by breaking a window and banging on the Senate Wing Door. The first rioters entered the Capitol though the broken window. A minute later,

at approximately 2:13 p.m., rioters who entered the inside of the Capitol window successfully broke open the Senate Wing Door, allowing a flood of rioters to enter.

At approximately 2:23 p.m., Gleffe was captured on closed circuit surveillance video, entering the Capitol through the Senate Wing Door. Gleffe used his cellphone to document himself entering the building. *See* Image 9, below.

*Image 9*



Gleffe's "Trump 2020 Make America Great" flags were unfurled as he entered. *See* Image 10, below.

*Image 10*



As Gleffe entered, sirens inside of the Capitol were blaring, providing an audible signal to the rioters that the Capitol was breached.

After entering the Senate Wing Door, Gleffe followed rioters as they entered the Crypt. Gleffe entered the Crypt at approximately 2:25 p.m., among the first rioters to do so. *See* Images 11 and 12, below. Other rioters physically assaulted officers as they made their way inside of the Crypt. Gleffe remained inside of the Crypt during those assaults but did not join on them.

*Image 11*



*Image 12*



Gleffe remained inside of the Crypt for approximately five minutes before making his way back to Senate Wing Door, his point of entry, at approximately 2:34 p.m. Upon arriving at the location, Gleffe observed a line of officers who were responding to the breach of the Senate Wing Door and attempting to rid the Capitol of rioters. Before exiting, Gleffe spoke with one of the officers standing near the exit. *See* Image 13, below. Gleffe exited the Capitol at approximately 2:34 p.m., after being inside the building for approximately 11 minutes.

*Image 13*



Gleffe traveled back to Virginia and stayed in his hotel the night of January 6  before returning to his home in Illinois.

*Social Media Posts*

Before the attack on the Capitol, Gleffe used his personal Facebook page to encourage his followers to watch and share a livestream of the "DC event" on January 6. While Gleffe did not specify the event of which he was referring, he directed his followers to watch the event on a Parler account with the handle name "@fightthefraud." *See* Image 14, below.

*Image 14*



The Federal Bureau of Investigation searched the handle name "@fightthefraud." A screenshot of the account page depicted the following. *See* Image 15, below:

*Image 15*



On January 6, Gleffe used Facebook to document his trip to the Capitol. He used Facebook Live to post pictures and videos of himself while he was at the rally. Although he used his cellphone to take pictures and videos of himself while he was inside of the Capitol, he did not post images of himself inside of the Capitol on Facebook.

After the attack on the Capitol, Gleffe used Facebook to talk about what he observed while at the Capitol. Gleffe stated that the attack on the Capitol was not caused by "true patriots," instead claiming that members of Antifa "blended in and made us look bad." Gleffe also boasted about

the increase in the number of followers he gained "overnight" after his posts from January 6, stating, "I went from 38k followers to 61k followers overnight." *See* Image 16, below.

*Image 16*



*Defendant's FBI Interview*

On May 3, 2021, Gleffe gave a pre-arrest interview to the FBI. During the interview, he admitted to traveling to Washington D.C. to livestream the events of January 6 on his business' social media account, in hopes of making a monetary profit. Gleffe stated that he was unable to livestream video from the rally due to poor service.

Prior to arriving in Washington, D.C., Gleffe saw posts on Parler, Telegram, and Facebook stating that there was a possibility of violent activity on January 6. He recalled seeing posts about individuals planning to bring firearms to D.C.

After attending the rally, Gleffe heard a group of individuals say, "We're storming the Capitol." Gleffe joined with the group of rally attendees walking in the direction of the Capitol. Gleffe described what he observed as he approached the Capitol. He recalled seeing barriers

pushed over onto the ground. He also recalled standing behind a group of individuals "pushing up against cops." Gleffe was so close to this assault that he was teargassed. Gleffe witnessed a woman get hit in the face with a flash bang grenade thrown by officers. He described seeing individuals in tactical gear, carrying shields and walkie-talkies, clustered in small groups outside of the Capitol.

Gleffe admitted to entering the Capitol, claiming that he entered through a "back door." Gleffe claimed that officers posted outside of the doorway allowed him to enter the building. In his statement to FBI, Gleffe told the agents that he only made the decision to leave the building after his mother told him to leave.

During his interview with FBI, Gleffe told agents that he would email the photographs and videos that he took on January. Gleffe never sent the items to the FBI after his interview.

Gleffe knew at the time he entered the Capitol that he did not have permission to enter the building and he paraded, demonstrated, or picketed inside the building.

*The Charges and Plea Agreement*

On September 1, 2021, the United States charged Gleffe by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On September 2, 2021, law enforcement officers arrested him at his home in Illinois. On November 30, 2021, the United States charged Gleffe by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On September 8, 2022, pursuant to a plea agreement, Gleffe pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Gleffe agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Gleffe now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Gleffe faces up to six months of imprisonment and a fine of up to $5,000. Gleffe must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days' incarceration, followed by 36 months' probation.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Gleffe's

participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Gleffe, the absence of violent or destructive acts is not a mitigating factor. Had Gleffe engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Gleffe's case is that he was in the initial wave of rioters who breached the Crypt at approximately 2:25 p.m. Approximately ten minutes earlier, a large crowd of rioters gathered near the Crypt. The line of officers who responded to the location were able to hold back the rioters until approximately 2:18 p.m., when an officer was pulled into the Crypt. Seconds later, rioters threw a 2x4 inch board into the Crypt. Rioters used their own bodies to continue the attack on the line of officers at approximately 2:20 p.m. Gleffe was part of that group of rioters. At approximately 2:25 p.m., the rioters finally overwhelmed the line of officers and flooded the Crypt. Given that he entered with the wave of rioters who first breached the Crypt, Gleffe would have observed the officers being overrun by the rioters.

The second most important factor in Gleffe's case is that he observed violence to officers prior to entering the Capitol, and yet, he made the decision to enter the Capitol. In his statement to FBI, Gleffe described hearing protestors in the crowd at the conclusion of the rally, stating that the crowd was going to "storm the Capitol." Prior to arriving in Washington D.C., Gleffe knew that there was a potential for violence on January 6, claiming to have seen social media posts about protestors bringing firearms into the district on January 6. This did not deter Gleffe from traveling to Washington.

Walking to the Capitol, Gleffe saw  barricades on the ground. He first observed rioters assaulting police officers outside of the Capitol. He admittedly saw a group of protestors "pushing up" against officers. This visual, and the smell of teargas, provided additional notice to Gleffe that

his presence, and the presence of other protestors, that he was joining in a mob attack on the police. Nevertheless, Gleffe continued to make his way to the Capitol, approaching from the northwest side of the West Front of the Capitol, an area where the rioters engaged insignificant violence against the officers. And while Gleffe claims that officers standing outside of the Senate Wing Doors permitted him to enter the building, the government has uncovered no video evidence to support that claim. And in light of the circumstances described above, Gleffe cannot credibly claim that he was being invited by police to enter the Capitol.

Another important factor is Gleffe's use of social media during and after the Capitol breach. According to his January 7 Facebook post, Gleffe's social media followers increased from 38,000 followers to 61,000 followers in a single day. Although Gleffe told agents that he was unable to livestream at the rally due to poor service, he admitted that he posted a video of the group of protestors, whom he heard boasting that they were going  to "storm the Capitol."

While Gleffe claimed that he was unable to post videos from the rally, a concerned citizen who knows Gleffe reported to the FBI that he/she saw pictures and videos of the rally on Facebook Live that Gleffe took. Facebook Live allows Facebook users to post videos and pictures to their Facebook page that will automatically delete 24-hours after being posted. Given the increase in followers that Gleffe claimed to have received within a day of January 6, Gleffe likely did post videos and photographs of himself that would have been visible to his Facebook followers on January 6.

In his January 7 post to Facebook, Gleffe did not express remorse or contrition for what occurred on January 6. Instead, he attributed the "destruction" that occurred to have been caused by Antifa, as opposed to "true Patriots."

Since January 6, Gleffe has expressed remorse for his conduct on January 6. Gleffe described his conduct on January 6 as the "biggest mistake" of his life. He expressed regret and remorse for entering the Capitol. This admission is a mitigating factor that should be weighed against the factors that weigh in favor of incarceration.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

## B.  Gleffe's History and Characteristics

As set forth in the PSR, Gleffe's criminal history consists of a conviction for possession of a controlled substance. ECF 32 ¶¶ 22-26. In 2004, Gleffe was arrested and charged with a DUI/Alcohol, Fleeing/Attempting to Elude an Officer, and Illegal Lane Use. In 2006, Gleffe was arrested and charged with Violation of Bail Bond.

At the time of his arrest in the instant offense, Gleffe was unemployed. Gleffe reported to U.S. Probation that he is self-employed as a tile worker.

On August 30, 2022, a violation of pretrial supervision hearing was held based on the fact that Gleffe moved from Illinois to Florida without the permission of U.S. Probation. *Id*. at ¶ 5. After the hearing, the issue was resolved with the Court permitting defendant's relocation to the Middle District of Florida. *Id*. Gleffe has been otherwise compliant with his conditions of pre-trial release. *Id*.

## C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I

16

don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This

was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Gleffe's conduct on January 6 demonstrates the need for specific deterrence. Before arriving at the Capitol, Gleffe was aware of the potential for violence at the Capitol. During his walking to the Capitol, Gleffe observed protestors fighting with police officers, he observed barricades trampled by protestors, he observed violent clashes between the rioters and the officers near on the West Front, and yet, he entered the Capitol on January 6. Inside of the Capitol, Gleffe was in the initial wave of rioters who breached the Crypt. Gleffe was undeterred, and in the aftermath of January 6, boasted about entering the Capitol on his social media.

The government acknowledges that Gleffe accepted responsibility early by entering into this plea agreement.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This

---

[2] Attached to this sentencing memorandum is a table (marked as Exhibit 1) providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

Court must sentence Gleffe based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct:  his participation in the January 6 riot.

Gleffe has pleaded guilty to Count Four of the Superseding Information, charging him with parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section

3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed,

and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his

exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, this Court may consider the sentences imposed in cases where defendants approached the Capitol from the West Front and used social media to promote their presence at the Capitol on January 6. One such case is *United States v. Mahailya Pryer,* 21-cr-667 (FYP). There, the defendant unlawfully entered the Capitol at the Rotunda Doors; encouraged and celebrated the riot through her social media account minutes before entering the Capitol; bragged about her involvement and justified the riot through her social media accounts in the hours and days after the riot; admittedly deleted incriminating information from her mobile telephone before she was arrested in this case; had an extensive criminal history and was on probation for felony offenses when she traveled to Washington D.C. and participated in the riot. This Court sentenced Pryer to 45 days' incarceration and 36 months' probation. Although Gleffe does not have a substantial criminal history and was not on probation on January 6, Pryer was not among the first group of rioters who breached the Crypt.

*United States v. Andrew Galloway,* 22-cr-12 (CRC), is another comparable case. There, the defendant breached the U.S. Capitol through a broken window near the Senate Wing Doors within approximately 11 minutes of the initial breach; made false self-exonerating statements to FBI agents about his participation in the riot; and loudly and publicly expressed his support for the riot shortly after leaving the Capitol building. Gleffe and Galloway both witnessed violence directed at officers who were attempting to maintain and regain control of the Capitol. While Galloway did not use social media to publicly express his support for the riot as Gleffe did after January 6, both promoted what occurred on January 6, neither immediately expressing remorse the day after

January 6. A distinguishing factor is that Gleffe has expressed remorse, while Galloway did not. Admittedly, Galloway had other aggravating factors, such as an affinity for the Proud Boys, that Gleffe does not.  Judge Cooper sentenced Galloway to 30 days incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

As this Court and eight other judges of this District have now concluded, this Court has the authority under 18  § 3561(a)(3) to impose a "split sentence," *i.e.*, a sentence requiring both a term of imprisonment and a term of probation, on a defendant who has been convicted of a "petty offense." *See, e.g.*, *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case), *appeal pending*, D.C. Circuit No. 22-3018; *United States v. Entrekin*, 21cr686 (FYP), ECF 34 (D.D.C. May 6, 2022) (same); *United States v. Sarko*, No. 21cr591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible

in a petty offense case); *United States v. Caplinger*, No. 21cr342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21cr290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21cr630 (CJN), ECF 37 (D.D.C. April 22, 2022) (same); *United States v. Revlett*, 21cr281 (JEB), ECF 46 (D.D.C. July 7, 2022) (same); *United States v. Getsinger*, 21cr607 (EGS), ECF 60 (D.D.C. July 12, 2022) (same); *United States v. Ticas*, 21cr601 (JDB), ECF 40 (D.D.C. July 15, 2022) (same); *United States v. Caplinger*, 21cr342 (PLF), ECF 74 (D.D.C. August 1, 2022) (same); *United States v. Ferreira*, 22cr210 (TSC) (D.D.C. October 6, 2022).[3]

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to a split sentence of 45 days' incarceration, followed by a term of probation of 36 months, 60 hours of community service, and $500 in restitution.

---

[3] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months' incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his/her crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ *Brittany L. Reed*
BRITTANY L. REED
LA Bar No. 31299
Assistant United States Attorney (Detailee)
U.S. Attorney's Office
650 Poydras Street, Ste. 1600
New Orleans, LA 70130
Office: 504-680-3031
Brittany.Reed2@usdoj.gov

## CERTIFICATE OF SERVICE

On this 2nd day of December 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

/s/ *Brittany L. Reed*
BRITTANY L. REED
Assistant United States Attorney (Detailee)